# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

IN RE: BROILER CHICKEN GROWER ANTITRUST LITIGATION (NO. III)

This Document Relates To:
ALL ACTIONS

**CONSOLIDATED CLASS ACTION COMPLAINT**

Case No. 2:25-MD-03167-DBB-CMR

District Judge David Barlow

Magistrate Judge Cecilia M. Romero

**JURY TRIAL DEMANDED**

Plaintiffs HAFF POULTRY INC., NANCY BUTLER, JAMES MICHAEL MERCER, JONATHAN WALTERS, MARC MCENTIRE, KAREN MCENTIRE, and DANIEL W. GAINES, JR. (collectively, "Plaintiffs"), on behalf of themselves and all other similarly situated broiler chicken growers, bring this antitrust and unfair competition action seeking treble damages under Section 1 of the Sherman Antitrust Act and Section 202 of the Packers and Stockyards Act, demanding a trial by jury of all issues so triable.

Plaintiffs allege the following, based upon personal knowledge as to matters relating to themselves, and upon information and belief and the investigation of counsel as to all other matters:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of a proposed class of broiler chicken ("Broiler") growers, also known as poultry growers (referred to herein as "Growers"), against vertically-integrated poultry company defendants ("live poultry dealers" or "Integrators"), which operate Broiler processing plants ("Complexes"), concerning the Integrators' anticompetitive, collusive, predatory, unfair, and bad faith conduct in the domestic market for Broiler growing services (also referred to herein as "Broiler Grow-Out Services"). This case involves agreements by the Defendants (defined below) and their Co-Conspirators (defined more fully, *infra*, and together with the Defendants, the "Cartel") to reduce competition for Broiler Grow-Out Services by agreeing to limit or eliminate efforts to solicit, recruit, or hire one another's Growers, with the purpose and effect of fixing, maintaining, and/or stabilizing Grower compensation below competitive levels (the "No-Poach Agreement").

2. By agreeing not to compete for the services of one another's Growers, the Cartel members attempted to insulate themselves from normal competitive pressures. The No-Poach Agreement inoculated the Cartel against competition for Grower pay and "wars" for Grower labor, which would have a market wide ripple effect on Grower compensation because of standardization in

Grower contracts and pay rates (for example, Grower pay was not individually negotiated but offered on a take it or leave it basis to all similarly situated Growers).

3. The No-Poach Agreement was designed to keep Growers, as author Christopher Leonard noted in *The Meat Racket: The Secret Takeover of America's Food Business*, "in a state of indebted servitude, living like modern-day sharecroppers on the ragged edge of bankruptcy."

## PARTIES

4. Plaintiff Haff Poultry, Inc. is owned by Steve Haff, his wife, and his father-in-law. Haff Poultry, Inc. (collectively "Haff") began providing Broiler Grow-Out Services for Hudson, a major poultry producer, in Oklahoma in 1996. Haff borrowed $365,000 to build four Broiler houses to Hudson's specifications. When Co-Conspirator Tyson (defined *infra*) purchased Hudson, Haff became a grower for Tyson. During the course of Haff's time providing Broiler Grow-Out Services for Tyson, Tyson demanded that Haff make further investments in its Broiler houses. Haff borrowed or spent another $250,000 making these improvements to its Broiler houses because Tyson threatened not to deliver Broilers for Haff to care for unless Haff did so. Haff would not have been able to make ends meet with Tyson's compensation alone, and so ran a separate and profitable cattle-raising operation at the same time. In October 2015, Haff quit providing Broiler Grow-Out Services. Haff was left with four Broiler houses that have no value other than caring for Broilers, and $130,000 in lingering debt. Haff was unaware of the existence, scope, duration, and terms of the No-Poach Agreement while Haff provided Broiler Grow-Out Services. Haff could not, through reasonable diligence, uncover sufficient information to plead claims against the Defendants in this lawsuit until the May 9, 2024 class certification decision in *In Re Broiler Chicken Grower Antitrust Litigation (No. II)*, No. 6:20-md-02977-RJS-CMR (E.D. Okla.) (Dkt. No. 410), which put into the public record a robust set of facts and admissions from Co-Conspirators concerning the No-Poach Agreement.

5. Plaintiff Nancy Butler (d/b/a Butler Poultry) began providing Broiler Grow-Out Services for Co-Conspirator Perdue (defined *infra*) in Kentucky in 1996. Ms. Butler borrowed $250,000 to build two Broiler houses to Perdue's specifications. During the course of her time providing Broiler Grow-Out Services, Perdue required that Ms. Butler make further investments to her Broiler houses. Ms. Butler borrowed or spent at least another $50,000 making these improvements to her Broiler houses. Throughout her time providing Broiler Grow-Out Services, she was barely able to make ends meet with the compensation provided by Perdue. She recently took out another loan for required equipment. Ms. Butler was unaware of the existence, scope, duration, and terms of the No-Poach Agreement while she provided Broiler Grow-Out Services. Ms. Butler could not, through reasonable diligence, uncover sufficient information to plead claims against the Defendants in this lawsuit until the May 9, 2024 class certification decision in *In Re Broiler Chicken Grower Antitrust Litigation (No. II)*, No. 6:20-md-02977-RJS-CMR (E.D. Okla.) (Dkt. No. 410), which put into the public record a robust set of facts and admissions from Co-Conspirators concerning the No-Poach Agreement.

6. Plaintiff James Michael (Mike) Mercer began providing Broiler Grow-Out Services for Cagle Foods in 1995. Cagle Foods was subsequently purchased by Co-Conspirator Tyson (defined *infra*). Mr. Mercer borrowed $905,000 to build and update Broiler houses. But Tyson refused to deliver Broilers to Mr. Mercer without additional improvements to his Broiler houses. Mr. Mercer was unable to afford these updates. Mr. Mercer has been left with eight Broiler houses that have no other value and over half a million dollars in lingering debt. Mr. Mercer was unaware of the existence, scope, duration, and terms of the No-Poach Agreement while Mr. Mercer provided Broiler Grow-Out Services. Mr. Mercer could not, through reasonable diligence, uncover sufficient information to plead claims against the Defendants in this lawsuit until the May 9, 2024 class certification decision in *In Re Broiler Chicken Grower Antitrust Litigation (No. II)*, No. 6:20-md-02977-RJS-CMR (E.D. Okla.)

(Dkt. No. 410), which put into the public record a robust set of facts and admissions from Co-Conspirators concerning the No-Poach Agreement.

7. Plaintiff Jonathan Walters began providing Broiler Grow-Out Services for Co-Conspirator Sanderson (defined *infra*) in Mississippi in approximately 2001. Mr. Walters borrowed $639,000 to build four Broiler houses to Sanderson's specifications. Over his time providing Broiler Grow-Out Services, Sanderson demanded that Mr. Walters make further investments into his Broiler houses. Mr. Walters borrowed or spent another $100,000 making these improvements to his Broiler houses because Sanderson threatened not to deliver Broilers for Mr. Walters to care for unless he did so. Mr. Walters would not have been able to make ends meet with Sanderson's compensation alone, and so worked several other part-time jobs while caring for Broilers. In December 2015, Mr. Walters quit providing Broiler Grow-Out Services. Mr. Walters was left with four Broiler houses that have no value outside of caring for Broilers and $130,000 in debt. Mr. Walters had to mortgage his residence—which he owned outright before he began caring for Broilers—to secure that debt. Mr. Waters was unaware of the existence, scope, duration, and terms of the No-Poach Agreement while Mr. Waters provided Broiler Grow-Out Services. Mr. Waters could not, through reasonable diligence, uncover sufficient information to plead claims against the Defendants in this lawsuit until the May 9, 2024 class certification decision in *In Re Broiler Chicken Grower Antitrust Litigation (No. II)*, No. 6:20-md-02977-RJS-CMR (E.D. Okla.) (Dkt. No. 410), which put into the public record a robust set of facts and admissions from Co-Conspirators concerning the No-Poach Agreement.

8. Plaintiffs Marc McEntire and Karen McEntire began providing Broiler Grow-Out Services for Co-Conspirator Pilgrim's (defined *infra*) in Texas in 2004. The McEntires borrowed at least $100,000 to make improvements to three Broiler houses to Pilgrim's specifications. During the course of their time providing Broiler Grow-Out Services, Pilgrim's required that they make further investments to their Broiler houses. The McEntires borrowed or spent at least another $20,000

making these improvements to their Broiler houses. Throughout their time providing Broiler Grow-Out Services, they were barely able to make ends meet with the compensation provided by Pilgrim's. The McEntires would not have been able to make ends meet with Pilgrim's compensation alone, and so worked other full-time jobs while caring for Broilers. In 2014, they quit providing Broiler Grow-Out Services and sold their property. The McEntires were unaware of the existence, scope, duration, and terms of the No-Poach Agreement while they provided Broiler Grow-Out Services. The McEntires could not, through reasonable diligence, uncover sufficient information to plead claims against the Defendants in this lawsuit until the May 9, 2024 class certification decision in *In Re Broiler Chicken Grower Antitrust Litigation (No. II)*, No. 6:20-md-02977-RJS-CMR (E.D. Okla.) (Dkt. No. 410), which put into the public record a robust set of facts and admissions from Co-Conspirators concerning the No-Poach Agreement.

9. Plaintiff Daniel W. Gaines, Jr. began providing Broiler Grow-Out Services for Defendant Mountaire Farms, Inc. in 2007. Throughout his time providing Broiler Grow-Out Services, Mr. Gaines had to borrow at least $200,000 to change his Broiler houses to Mountaire's specifications. Mr. Gaines was barely able to make ends meet with the compensation provided by Mountaire for Broiler Grow-Out Services. In 2022, he quit providing Broiler Grow-Out Services and sold his property. To sell his property, Mr. Gaines had to borrow another $60,000 to upgrade his farm because Mountaire refused to provide the farm with chickens unless the upgrades were implemented. Mr. Gaines was unaware of the existence, scope, duration, and terms of the No-Poach Agreement while they provided Broiler Grow-Out Services. Mr. Gaines could not, through reasonable diligence, uncover sufficient information to plead claims against the Defendants in this lawsuit until the May 9, 2024 class certification decision in *In Re Broiler Chicken Grower Antitrust Litigation (No. II)*, No. 6:20-md-02977-RJS-CMR (E.D. Okla.) (Dkt. No. 410), which put into the public record a robust set of facts and admissions from Co-Conspirators concerning the No-Poach Agreement.

10. Defendant Mountaire Farms, Inc. is a privately owned poultry processor founded in 1914 and headquartered in Millsboro, Delaware. Defendant Mountaire Farms of Delaware, Inc. is a Delaware corporation and is a wholly owned subsidiary of Mountaire Farms, Inc. Defendants Mountaire Farms, Inc. and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms." Mountaire Farms engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 5.6 percent of Broilers by weight during the Class Period. Mountaire Farms operated four Broiler complexes during the Class Period in Delaware and North Carolina.

11. Defendant Peco Foods, Inc. is a privately owned poultry processor founded in 1937 and headquartered in Tuscaloosa, Alabama. Peco Foods, Inc. engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 3.6 percent of Broilers by weight during the Class Period. Peco Foods, Inc. operated six Broiler complexes during the Class Period in Mississippi, Arkansas, and Alabama.

12. Defendant House of Raeford Farms is a privately owned poultry processor founded in 1955 and headquartered in Rose Hill, North Carolina. Defendant House of Raeford Farms of Louisiana, LLC is a wholly-owned subsidiary of House of Redford Farms, Inc. Defendants House of Raeford Farms, Inc. and House of Raeford Farms of Louisiana, LLC are collectively referred to as "House of Raeford." House of Raeford engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 3.2 percent of Broilers by weight during the Class Period. House of Raeford operated five Broiler complexes during the Class Period in South Carolina, North Carolina, and Louisiana.

13. Defendant George's Inc. is a privately owned poultry processor headquartered in Springdale, Arkansas. The following defendants are wholly owned or controlled subsidiaries of George's, Inc.: Ozark Mountain Poultry, Inc. (Arkansas), George's Chicken, LLC (Virginia),

George's Foods, LLC (Virginia), and George's Processing, LLC (Arkansas). Collectively, these defendants are referred to as "George's." George's engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 2.8 percent of Broilers by weight during the Class Period. George's operated four Broiler complexes during the Class Period in Arkansas, Missouri, and Virginia.

14. Defendant Foster Farms, LLC is a poultry processor founded in 1939 and headquartered in Livingston, California. Defendant Foster Poultry Farms is a privately held California corporation and a related entity of Foster Farms, LLC. The two defendants are collectively referred to as "Foster Farms." Foster Farms engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 2.6 percent of Broilers by weight during the Class Period. Foster Farms operated four Broiler complexes during the Class Period in California, Louisiana, and Washington.

15. Defendant Amick Farms Inc. is a poultry processor founded in 1941 and headquartered in Batesburg, South Carolina. It was acquired by OSI Group, LLC, a privately held Delaware corporation with its principal place of business in Illinois, in 2006. Amick Farms, Inc. engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 2.4 percent of Broilers by weight during the Class Period. Amick Farms Inc. operated two Broiler complexes during the Class Period in Maryland and South Carolina.

16. Defendant Case Foods, Inc. is a privately owned poultry processor founded in 1986 and headquartered in Troutman, North Carolina. Case Farms Processing, Inc., is a North Carolina corporation and is a wholly owned subsidiary of Case Foods, Inc. Together, they are referred to as "Case Foods." Case Foods engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 2.2 percent of Broilers

by weight during the Class Period. Case Foods operated three Broiler complexes during the Class Period in North Carolina and Ohio.

17. Defendant Fieldale Farms Corp. is a privately owned poultry producer headquartered in Baldwin, Georgia. Fieldale Farms Corp. engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 1.8 percent of Broilers by weight during the Class Period. Fieldale Farms Corp. operated two Broiler complexes during the Class Period in Georgia.

18. Defendant Mar-Jac Holdings, Inc. is incorporated in Delaware and headquartered in Gainesville, Georgia. It is the parent company of the following wholly owned or controlled subsidiaries: Mar-Jac Poultry, Inc. (Georgia), Mar-Jac Poultry MS, LLC (Mississippi), Mar-Jac Poultry AL, LLC (Alabama), and Mar-Jac Poultry, LLC (Georgia). Together these Defendants are referred to as “Mar-Jac.” Mar-Jac engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 1.8 percent of Broilers by weight during the Class Period. Mar-Jac operated three Broiler complexes during the Class Period in Alabama, Mississippi, and Georgia.

19. Defendant O.K. Industries is a poultry processor headquartered in Fort Smith, Arkansas. O.K. Industries was acquired by Industrias Bachoco S.A., a Brazilian corporation, in 2011. It engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 1.7 percent of Broilers by weight during the Class Period. O.K. Industries operated two Broiler complexes during the Class Period in Arkansas and Oklahoma.

20. Defendant Simmons Foods Inc. is a privately owned poultry processor founded in 1949 and headquartered in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is an Arkansas company that is a wholly owned subsidiary of Simmons Foods. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as “Simmons.” Simmons engages in the

conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 1.6 percent of Broilers by weight during the Class Period. Simmons Foods Inc. operated four Broiler complexes during the Class Period in Arkansas and Missouri.

21. Defendant Allen Harim is a privately owned poultry processor founded in 1919 and headquartered in Seaford, Delaware. Allen Harim engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 0.9 percent of Broilers by weight during the Class Period. Allen Harim operated two Broiler complexes during the Class Period in Delaware and Maryland.

22. Defendant Harrison Poultry, Inc. is a privately owned poultry processor founded in 1958 and headquartered in Bethlehem, Georgia. Harrison Poultry, Inc. engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 0.6 percent of Broilers by weight during the Class Period. Harrison Poultry operated one Broiler complex during the Class Period in Georgia.

23. Defendant Norman W. Fries, Inc. d/b/a Claxton Poultry Farms ("Claxton Poultry") is a privately owned poultry processor founded in 1949 and headquartered in Claxton, Georgia. Claxton Poultry engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. It accounts for 1.0 percent of Broilers by weight during the Class Period.

24. Defendants are also collectively referred to herein as the "Major Integrators."

## AGENTS AND CO-CONSPIRATORS

25. Tyson Foods, Inc. is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Tyson Chicken, Inc. is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower

compensation below competitive levels. Tyson Breeders, Inc. is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Tyson Poultry, Inc. is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Tyson Foods, Inc. is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Together, these companies are referred to as "Tyson." Tyson operated 34 Broiler complexes during the Class Period in Alabama, Arkansas, Georgia, Indiana, Kentucky, Massachusetts, Mississippi, Missouri, North Carolina, Pennsylvania, Tennessee, Texas, and Virginia.

26. Wayne Farms is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Wayne Farms operated nine Broiler complexes during the Class Period in Alabama, Arkansas, Georgia, Mississippi, and North Carolina.

27. Pilgrim's Pride Corporation is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Pilgrim's Pride operated 34 Broiler complexes during the Class Period across Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Minnesota, North Carolina, South Carolina, Tennessee, Texas, Virginia, and West Virginia and Puerto Rico.

28. Perdue Foods, LLC ("Perdue") is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Perdue operated 9 Broiler complexes during the Class Period in Delaware, Georgia, Kentucky, Maryland, North Carolina, South Carolina, and Virginia.

29. Koch Foods, Inc. is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Koch Meat Co., Inc., d/b/a

Koch Poultry Co. ("Koch") is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Koch operated eight Broiler complexes during the Class Period across Alabama, Georgia, Mississippi, and Tennessee.

Sanderson Farms, Inc. is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Sanderson Farms, Inc. (Foods Division) is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Sanderson Farms, Inc. (Production Division) is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Sanderson Farms, Inc. (Processing Division) is an Integrator that engages in the conduct alleged herein with the aim and effect of suppressing Grower compensation below competitive levels. Together, these companies are referred to as "Sanderson." Sanderson operated twelve Broiler complexes during the Class Period Georgia, Louisiana, Mississippi, Missouri, North Carolina, and Texas.

30. Co-Conspirators and Defendants are referred to collectively as the "Cartel."

## JURISDICTION AND VENUE

31. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under the Packers and Stockyards Act of 1921, 7 U.S.C. § 192, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections Four and Sixteen of the Clayton Act Antitrust Act of 1914, 15 U.S.C. §§ 15 and 26.

32. The transferor courts have personal jurisdiction over the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum states.

33. Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state, including the domestic sale of Broilers.

34. Defendants, directly or through their agents, engage in interstate commerce in the production, processing, and distribution of Broilers for sale in the United States.

35. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District, and certain of the unlawful acts alleged herein were performed and had effects within this District.

## FACTUAL BACKGROUND

### The Broiler Grow-Out Services Industry

36. Broilers—young chickens bred for meat—account for nearly all domestic chicken consumption. Broiler[1] production is concentrated into localized networks of production dominated by vertically integrated poultry companies. Integrators (such as Defendants herein) control virtually every aspect of Broiler production, although they do not care for the birds themselves. Instead, they enter into so-called contract farming arrangements ("CFAs"), also known as "poultry growing arrangements," with thousands of Growers, which are predominately small, family-owned farm operations that provide the Integrators with Broiler Grow-Out Services until the birds reach slaughtering age. Broiler Growers operating under CFAs care for over 97% of domestic Broilers produced annually in the United States. For decades, there has not been a spot or cash market for Broilers, largely because Defendants and Co-Conspirators, through their vertically integrated operations, control all aspects of Broiler production and do not obtain Broilers other than through CFAs.

[1] The term "Broilers" as used here includes specialty chicken that is grown, processed, and sold according to halal, kosher, free range, pasture-raised, or organic standards.

37. Commercial poultry production began in the United States in the 1930s with the development of the Broiler—a chicken specifically bred for meat (prior to that, poultry was generally a byproduct of egg production). At that time, hatcheries, feed mills, farms, and processors were generally all non-affiliated separate entities.

38. Hatcheries (where Breeder eggs are hatched to be raised as Broilers) have vertically coordinated activities between the feed mill operators, Growers, and processors. Feed mill operators began to extend credit to Growers to buy baby chicks and the necessary feed. When the flock became market-ready, the Grower would sell the chicken to the processor and pay off the debt it owed to the feed mill operator.

39. In the middle of the century, a dramatic shift took place in the way that poultry was raised for consumption. By the 1960s, some ninety percent of Broilers came from vertically integrated operations that owned or otherwise controlled the hatcheries, feed mills, farms, and processors.

40. The result of this market shift was the creation of the modern Broiler industry, the most vertically integrated segment of agriculture today. There are only approximately 25 Integrators in the nation. They supply their vertically integrated production complexes ("Complexes") with Broilers cared for pursuant to agreements with approximately thirty-thousand poultry growers. Complexes typically include one or more hatcheries, feed mills, slaughter plants, and further processing plants that are owned and operated by the Integrator.

41. The Defendants and their Co-Conspirators have devised a system of "factory farming" that effectively transfers the risk of Broiler production from them onto Growers.

42. While not caring for the birds themselves, Integrators (such as Defendants) control virtually every aspect of the Broiler Grow-Out process including: the genetics of the Broilers; the amount, type and timing of the Broilers delivered to a Grower to care for; the composition, amount, and delivery schedule of feed; the distribution of medical services and medication; the structure,

temperature, ventilation, lighting duration, and other environmental aspects of the Broiler houses; the decision of whether to cull or condemn Broilers; the length of time that Growers are permitted to care for the Broilers; the time, method, and manner that Broilers will be picked up for processing; the time between when Broilers are picked up and when they are weighed; and the disposal method of birds and their excrement by the Growers.

43. Growers use land, which they have purchased and developed for the purpose of caring for Broilers, to take in Broilers owned by the Integrators, and care for those Broilers until the Integrators decide to take them back, bearing all of the physical, environmental and health impacts from caring for the birds, even though the Growers never own the animals.[2]

44. Integrators provide birds, feed, veterinary services, and mandated supervision to their Growers; the Growers provide labor, utilities, and substantial up-front investment capital required to care for the Broilers to slaughtering age, *i.e.*, Broiler Grow-Out Services. The Growers are responsible for investing the capital needed to build and maintain Broiler houses, maintain ownership of the land upon which the Broiler houses are located, provide the equipment, care for the Broilers (pursuant to Defendants' exclusive specifications), and pay for all labor needed to successfully care for the Broilers until they reach slaughtering age (which is determined by the Integrator in its sole discretion).

45. The Integrators determine the precise specifications for Grower's grow-out houses and other equipment. Integrators typically provide little to no capital for the grow-out facilities, although such facilities must be built to Integrators' precise, onerous, and sometimes arbitrary specifications. Growers are prohibited from using any inputs (*e.g.*, birds, feed, or medicine) other than those provided

[2] The Packers & Stockyards Act defines "poultry growers" as persons engaged in the business of raising and caring for live poultry for slaughter by another, regardless of whether the poultry is owned by such person or by another but not an employee of the owner of such poultry. *See* 7 U.S.C. § 183(a)(8).

by their Integrator, from raising or caring for Broilers provided by any competing Integrator, or from raising or caring for other poultry or birds of their own or obtained from any other source.

46. Growers must also maintain roads to their facilities, provide utilities and other fixed costs (including purchasing land and building grow-out facilities), and dispose of dead birds (even if the Integrator delivers dead Broilers). Integrators have an unlimited right to enter Growers' facilities to inspect birds, and can seize Growers' facilities—taking control until such time as the birds are ready for processing—if the Integrator determines in its sole discretion that the Grower is not performing adequately.

47. CFAs are substantially similar across Integrators, with nearly identical terms governing Integrator control and Grower compensation.

48. Defendants require Growers to be exclusive to one Integrator. The Cartel members do not permit Growers to provide Broiler Grow-Out Services for any other Integrator, even if their Integrator delays delivery of chicks or fails to deliver chicks at all and even if they could keep separate grow-out facilities on their farms or another separate farm owned by the Grower for each specific Integrator.

49. Growers often go into substantial debt to begin providing Grow-Out Services. A single grow-out house can cost $300,000 or more. According to one study, while the average Grower surveyed had been in the Broiler business for 16 years, one-third still had more than $200,000 in total farm debt.

50. Integrators have the most power over Growers when Growers are laden with debt from building or upgrading the grow-out facilities. Thus, Integrators are keenly aware of Growers' debt burdens, and require them to undertake unnecessary and expensive upgrades to their facilities to prevent their financial independence—with the intent of keeping Growers debt-laden.

51. Even a relatively well-performing Grower will often spend fifteen to twenty-five years recouping his or her investment or paying down its debt, and for those less fortunate, the possibility of economic independence is simply a fiction.

52. One prominent commentator observes that "[o]nce one enters the life of a grower, the trap is closed: high capital costs and large debt to enter the business, no input on product prices, no market in which to sell the goods and no way out except bankruptcy[.]"

53. Due to the control Integrators have over the grow-out process under their CFAs, Integrators are also the sole keepers of information that Growers need to estimate their expected profits. Although Integrators have information concerning Grower compensation, expected returns, and likely costs, Integrators intentionally do not provide such critical information to Growers. The information Integrators do provide to Growers is either misrepresented or omits material information—usually both.

54. Growers typically are subject to strict confidentiality requirements and strictly prohibited from sharing information on compensation with other Growers under their CFAs. These agreements have at times prevented some Growers from even sharing the terms of their agreements with lenders or other third-parties involved with financing.

55. In 2015, the domestic Broiler industry produced almost 9 billion Broilers, weighing 53 billion pounds "liveweight." That same year, Americans spent $90 billion buying chicken—making it the number one protein consumed in the United States.

**Defendants' Anticompetitive No-Poach Agreement**

56. Since at least 2008, and likely earlier, as part of their Scheme to artificially suppress Grower compensation, the Cartel members have agreed not to solicit or recruit Growers from one another, and in many instances, have agreed not to hire Growers from each other. This sometimes manifested in an outright prohibition on hiring one another's Growers under any circumstances. More commonly, it manifested as a prohibition on soliciting or recruiting one another's Growers to switch Integrators, and referred to by the Cartel members as a "no cold call" agreement, a "gentlemen's agreement," or a bar on "direct" or "active" recruitment of one another's Growers. In this latter

scenario, Integrators were permitted to hire another Integrator's Grower(s) if the Grower(s) first approach the Integrator about switching, but the Integrators could not initiate contact with the Grower(s) about switching; that is, they could not "cold call" or directly or actively recruit or solicit Growers to switch Integrators.

57. For example, in a letter to the Grain Inspection, Packers and Stockyards Administration ("GIPSA"), one Tyson Grower described how he was informed about this agreement:

> [Co-conspirator Peco Foods] ran an ad in the paper about five months ago, and I called because I knew business was good. I talked to a secretary and ***she told me that the companies had an agreement among each other to not take each other's growers***.

58. One article noted another Grower's difficulty in switching Integrators:

> [The Broiler farmer] noted that there were three other poultry processors in her area, but in the murky world of agribusiness, none of the other integrators would offer her a contract as a grower. ***For those not familiar with the poultry industry, there is an unwritten pact between poultry companies that each of them abide by: we won't poach your growers if you don't poach ours. For a farmer who falls out with one integrator in their area, it spells financial doom as no other company will pick up their contract to grow birds if they leave their current integrator.*** This type of collusion has not only limited opportunities and markets for farmers, but also put them in a position where there is no other option than to comply with the corporation's "take it or leave it" contracts and constantly shifting demands.

59. In a workshop entitled "Exploring Competition in Agriculture before the Department of Justice," another Grower confirmed the Cartel members' agreement not to solicit each other's Growers:

> When I started growing chickens in 1995 I bought land and moved 60 miles from where I grew up. I moved to the broiler capitol of my state. I did this thinking that . . . if I had a reason to switch from one integrator to another I could. ***After a few months into the business I realized that the integrators have an unwritten pact with their sister integrators, "You don't take our growers and we won't take yours."***

60. Another Grower testified: "In our area we have more than one company, but it seems to be a written [sic] rule that if you go grow for one company, you really don't have the opportunity to even cross those lines to go to another company."

61. Similarly, another Grower stated: "But as everyone else has said, in our community there are several companies, ***but once you start with one, that's the only one that will allow you a contract. They won't cross the lines to come to your farm***."

62. Employees of the Defendants and their Co-Conspirators admitted in testimony and written correspondence to the existence of the No-Poach Agreement.

63. One Pilgrim's manager wrote that Tyson and Pilgrim's "typically have not tried to cross lines" as they "have a good relationship and we try to stay out of each others [sic] area."

64. Another Pilgrim's manager testified that he "made a gentlemen's agreement amongst each other we [Pilgrim's] would not recruit broiler producers [Growers] from Harrison and he [Harrison] would not go to PPC ["Pilgrims"] producers [Growers] and try to recruit them."

65. A Koch manager testified that he spoke to a Pilgrim's manager and the two discussed that PPC was not "going to be calling on our growers trying to pick them up."

66. Another Pilgrim's manager testified that the No-Poach Agreement was an industrywide pact, an "an unwritten word" to not "go on anybody's farm while they [] have chickens and try and recruit that grower," stating that the unwritten word applied not just to Pilgrim's, but to the "chicken business, in general, everybody."

67. As a result of the Cartel's No-Poach Agreement, Growers very rarely switch Integrators. Studies show that few Growers have ever been able to successfully switch Integrators, and of those, almost none were able to obtain better contract terms in the switch. A study from 1999 reported that of the Growers who changed companies, 47% of those did so because "the old company closed or changed hands," while 12% reported that they were "cut off by their old company." Only a tiny percentage of Growers who switched did so of their own accord.

68. Only 2.88% of Growers switched in 2014 to go to another Integrator.

69. A recent study sponsored by the Cartel's own trade association (the National Chicken Council) indicated that in 2014, fewer than 5% of Growers were able to switch Integrators.

70. In those rare instances where Growers can switch Integrators, it is usually accompanied by a benefit to the Integrator the Grower is leaving. For example, Tyson may have excess processing capacity and Pilgrim's may have too many Growers under contract; in this scenario, the would-be horizontal competitors would allow Growers to switch from Pilgrim to Tyson, although without conferring any meaningful benefits to the Growers as a result of the switch. Absent the No-Poach Agreement, Integrators would have had to raise pay in order to maintain an adequate base of potentially mobile Growers.

71. One 2012 study by economists with the U.S. Department of Agriculture found that over three-quarters of Growers have more than one Integrator in their geographic area. Thus, the vast majority of Growers could, in theory, switch Integrators (even without moving geographically) in the absence of the conduct challenged in this case.

**Factors Rendering the Broiler Industry Conducive to Effective Collusion**

72. The Broiler industry is characterized by numerous features, or plus factors, that render the industry susceptible to collusion and bolster the plausibility of the Scheme alleged herein. These include: (1) high entry barriers for Integrators; (2) high exit barriers for Growers; (3) inelastic consumer demand for and a lack of substitutes for Broilers as well as Broiler Grow- Out Services; (4) industry concentration; (5) fungibility of Broiler Grow-Out Services; and (6) numerous opportunities to collude.

73. The Broiler industry is vertically integrated: Integrators control both the products, *i.e.*, the chickens, and the means by which to bring those products to market, *i.e.*, the feed mills, veterinary care, trucking operations, slaughterhouses, processing facilities, and sales contracts. As a result, it is

exceptionally expensive and logistically complex for new Integrators to emerge and compete with existing Integrators.

74. The Broiler industry is characterized by high entry barriers for Integrators. These include the high fixed costs of establishing a Broiler Complex and a distribution network capable of delivering Broilers to grocery chains or wholesalers for delivery to commercial eateries and end consumers and the high regulatory costs of ensuring compliance with onerous FDA mandates and regulations.

75. The Broiler industry is characterized by high exit barriers for Growers. To enter the market, Growers must make substantial financial investments tied to Broiler-specific equipment and facilities, which offer no use outside of caring for Broilers. This means that even faced with sub-competitive pay, Growers tend not to exit the Broiler Grow-Out Services market, because of the risk or inevitability of financial ruin from an inability to service that debt. Thus, once Growers enter the Broiler Grow-Out Services business, they become a captive audience, with little ability to avoid or circumvent the anticompetitive practices challenged herein.

76. In 1999, Growers had an average of 3.6 grow-out houses. While the average Grower surveyed had been in the Broiler business for 16 years, one-third still had more than $200,000 in total farm debt. In 2009 following Pilgrim's bankruptcy, Growers terminated as a result had up to $600,000 in lingering debt.

77. Moreover, Integrators monitor Growers' debt burdens, requiring Growers to undertake unnecessary and expensive upgrades if Growers ever do near financial independence. For example, in 2004, 49% of Growers were mandated to make improvements costing an average of $49,037.

78. Pursuant to Integrators' investment requirements, Growers shoulder over fifty percent of the total investment costs across the entire Broiler industry.

79. These large financial investments into Broiler-specific equipment and facilities mean that Growers can generally only service this debt by continuing to care for Broilers. As a result, Growers are insensitive to (*i.e.*, unlikely to exit the market because of) changes in compensation.

80. Demand for Broiler Grow-Out Services is relatively inelastic. Broilers are a staple food product and other meat products such as beef or pork are not generally considered to be reasonable substitutes for Broilers, either at the wholesale or retail levels. For the same reasons, demand for Broilers is relatively inelastic, although prices for Broilers are responsive to changes in supply.

81. The Broiler industry is highly concentrated. In 1995, there were 55 federally inspected Broiler companies operating in the United States. There were 41 in 2010, and by 2014, only 34—only 20 or so of which had any meaningful presence. The Broiler industry's top-4-firms' concentration ratio increased from 40.9% in 1997 to 57.9% in 2013. During the same time period, the top-8-firms' concentration ratio increased from 53.1% in 1997 to 79.3% in 2013.

82. As a result of vertical integration, there is no spot or cash market for Broilers, and there has not been for decades. Thus, there is no alternative for Growers to care for Broilers outside the confines of an agreement with an Integrator.

83. Broiler Grow-Out Services are fungible. Growers care for Broilers using Integrator's own birds, feed, and medicine. Growers bring to the table labor, investment capital, and land that are largely homogenous. Growers generally use the same type of grow-out facilities.

84. The Broiler industry is replete with opportunities to collude.

85. Affording the Cartel members opportunities to effectuate their anticompetitive Scheme against Growers, their officers regularly meet and communicate with one another through the National Chicken Council ("NCC"), a trade association whose officers represent a perpetual revolving door of high-ranking executives from Defendants and their Co-Conspirators.

86. The NCC's membership includes representatives from Integrators responsible for some 95% of Broiler production. The NCC offers a "forum in which industry members can share ideas and work towards solutions to common problems." It is the "unified voice of the chicken industry" and has a committee dedicated to "Growout" operations.

87. The NCC has three annual board meetings attended by Defendants' senior executives, including a January meeting held along with the International Poultry Expo, a mid-year Board of Directors Meeting, and the NCC annual meeting in October.

88. For the 2010-11 NCC cycle, the executive committee included the following individuals, serving one-year terms:

a. Lampkin Butts, ***Sanderson Farms***, Laurel, MS;
b. Alan Duncan, ***Mountaire Corporation***, Little Rock, AR;
c. Ron Foster, ***Foster Farms***, Livingston, CA;
d. Ben Harrison, Jr., ***Amick Farms, LLC***, Batesburg-Leesville, SC;
e. Michael Helgeson, Gold'n Plump Poultry, St. Cloud, MN;
f. Tom Hensley, ***Fieldale Farms***, Baldwin, GA;
g. Mark Hickman, ***Peco Foods***, Tuscaloosa, AL;
h. Donald Jackson, Pilgrim's Pride Corporation, Greeley, CO;
i. Mark Kaminsky, Koch Foods, Park Ridge, IL;
j. Bernard Leonard, Tyson Foods, Springdale, AR;
k. Bill Lovette, ***Case Foods***, Troutman, NC; and
l. Elton Maddox, Wayne Farms LLC, Oakwood, GA.

89. For the 2010-11 NCC cycle, the following individuals were appointed to the board of directors serving three-year terms:

a. John Comino, Southern Hens, Moselle, MS;
b. Paul Downes, ***Mountaire Corporation***, Millsboro, DE;
c. Elise Durbin, Marshall Durbin Companies, Birmingham, AL;
d. Gary George, ***George's***, Inc., Springdale, AR;
e. Trent Goins, ***OK Foods***, Fort Smith, AR;
f. Donald Jackson, Pilgrim's Pride Corporation, Greeley, CO;
g. Donnie King, Tyson Foods, Springdale, AR;
h. Elton Maddox, Wayne Farms LLC, Oakwood, GA;
i. Pete Martin, ***Mar-Jac Poultry***, Gainesville, GA;
j. James Perdue, Perdue Farms, Salisbury, MD;

k. Todd Simmons, ***Simmons Foods***, Siloam Springs, AR; and
l. Robert Turley, ***Allen Family Foods***, Seaford, DE.

90. For the 2011-12 NCC cycle, the executive committee included the following individuals, serving one-year terms:

a. Lampkin Butts, Sanderson Farms, Laurel, MS; (Chairman)
b. Bill Lovette, Pilgrim's Pride Corporation, Greeley, CO; (Vice-Chair)
c. Michael Helgeson, GNP Company, St. Cloud, MN; (Sec'y/Treasurer)
d. Alan Duncan, ***Mountaire Corporation***, Little Rock, AR;
e. Ron Foster, ***Foster Farms***, Livingston, CA;
f. Ben Harrison, Jr., ***Amick Farms, LLC***, Batesburg-Leesville, SC;
g. Mark Hickman, ***Peco Foods***, Tuscaloosa, AL;
h. Mark Kaminsky, Koch Foods, Park Ridge, IL;
i. Bernard Leonard, Tyson Foods, Springdale, AR;
j. Elton Maddox, Wayne Farms LLC, Oakwood, GA;
k. Jim Perdue, Perdue Farms, Salisbury, MD, and
l. Don Taber, ***House of Raeford***, Rose Hill, NC.

91. For the 2011-12 NCC cycle, the following individuals were appointed to the board of directors for three-year terms:

a. William Andersen, Keystone Foods, Huntsville, AL;
b. Robin Burruss, Tip Top Poultry, Marietta, GA;
c. Joe DePippo, Hain Pure Protein Corporation, Brevard, NC;
d. Carl George, ***George's***, Inc., Springdale, AR;
e. Robert Johnson, ***House of Raeford***, Rose Hill, NC;
f. Bernard Leonard, Tyson Foods, Springdale, AR;
g. Mike Roberts, Perdue Farms, Salisbury, MD;
h. Joe Sanderson, Jr., Sanderson Farms, Laurel, MS;
i. Thomas Shelton, ***Case Foods***, Eden, MD; and
j. Jerry Wilson, Pilgrim's Pride Corporation, Greeley, CO.

92. For the 2012-13 NCC cycle, NCC elected four officers to one-year terms:

a. Mike Brown, Vienna, VA, as President;
b. Bill Lovette, Pilgrim's Pride Corporation, Greeley, CO, as Chairman;
c. Michael Helgeson, GNP Company, St. Cloud, MN, as Vice-Chair; and
d. Jerry Lane, Pres., ***Claxton Poultry***, Claxton, Georgia, as Secretary.

93. For the 2014-15 NCC cycle, NCC selected four officers for one-year terms:

a. Jerry Lane, president of ***Claxton Poultry*** in Claxton, Georgia, as Chairman;
b. Todd Simmons. Chief Executive Officer of ***Simmons Foods***, as Vice-Chair;
c. Mike Popowycz, vice chairman and chief financial officer at ***Case Foods***, as Secretary-Treasurer; and
d. Mike Brown, of Vienna, Virginia, was elected to another term as president of NCC.

94. For the 2015-16 NCC cycle, NCC selected four officers for one-year terms:

a. Todd Simmons, Chief Executive Officer of ***Simmons Foods*** in Siloam Springs, Arkansas, as Chairman;
b. Mike Popowycz, vice chairman and chief financial officer at ***Case Foods***, as Vice-Chair;
c. Ben Harrison, president and chief executive officer of ***Amick Farms, LLC***, as Secretary-Treasurer; and
d. Mike Brown, of Vienna, Virginia, was elected to another term as president of NCC.

95. For the 2016-17 NCC cycle, NCC selected four officers for one-year terms:

a. Mike Popowycz, vice chairman and chief financial officer of ***Case Foods*** (Troutman, North Carolina), as Chairman;
b. Ben Harrison, president and chief executive officer of ***Amick Farms, LLC***, as Vice-Chair;
c. Mark Kaminsky, chief operating officer at Koch Foods, as Secretary-Treasurer; and
d. Mike Brown, of Vienna, Virginia, was elected to a fifth term as president of NCC.

96. In 2011, the NCC held meetings throughout the country, including its Annual Conference, attended by all executive committee officers and directors.

97. In 2012, the NCC held meetings throughout the country, including a March board of directors meeting, a June board of directors meeting, an October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

98. In 2013, the NCC held meetings throughout the country, including an October board of directors meeting and its Annual Conference in October, attended by all executive committee officers and directors.

99. In 2014, the NCC held a January board of directors meeting, a March "Day in Washington" meeting attended by the executive committee, a June board of directors meeting, an

October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

100. In 2015, the NCC held a January board of directors meeting, an April "Day in Washington" meeting attended by the executive committee, a June board of directors meeting, an October board of directors meeting, and its Annual Conference in October, attended by all executive committee officers and directors.

101. In 2016, the NCC held a June board of directors meeting, and its Annual Conference in October.

102. The Cartel members also have had the opportunity to collude through U.S. Poultry & Egg Export Council ("USAPEEC"), which involves quarterly meetings with executives from all or nearly all Defendants, the U.S. Poultry & Egg Association ("US Poultry"), of which the Defendants are members and which holds regular quarterly meetings, the Poultry Federation, which holds regular meetings involving executives from, *inter alia*, Pilgrim's and Tyson, and the International Poultry Council, of which Tyson, Sanderson, and Pilgrim's are individual members alongside the NCC, USAPEEC, and US Poultry as organizational members.

103. The Cartel members also permitted one another to tour each other's Complexes, which revealed confidential business methods employed by a company. These tours afforded the Cartel the opportunity to conspire among senior executives. In a competitive industry, production methods should be closely guarded to protect proprietary methods of production that save a company money and give it a competitive advantage. However, this is not the case in the Broiler industry. For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Farms Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three-day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and processing plant. Similarly, from April 19-21, 2015, another Chicken Media Summit

was sponsored by the NCC and USAPEEC and included tours of Perdue Farms' operations and panel discussions with the Defendants' senior executives.

104. Further, the Cartel members engage in a program of "feedmill cross-testing" in which some of the Cartel exchange feed and chicks with one another for the purported purpose of determining which Co-Conspirators' feed and/or chicks have superior qualities. The Cartel members claim, as a pretext, this strategy helps them maximize efficiency. However, it is not economically rational in a truly competitive market for an Integrator to provide its proprietary feed and/or chicks to its would-be competitors, thereby giving away any competitive cost advantage.

105. The Cartel members also permit high-level employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson was President of Foster Farms' Poultry Division until December 2008, when he immediately took a position as CEO of Pilgrim's Pride. Similarly, Clint Rivers, Pilgrim Pride's former President and CEO until December 2008, when he left the company and became Perdue Farms' Senior VP of Operations and Supply Chain Management. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Numerous other high level and lower level executives move freely between Broiler companies with little or no provisions to protect confidential information.

106. Finally, the Broiler industry has historically been the subject of antitrust scrutiny.

107. During the 1970s, major Broiler producers held weekly conference calls to discuss production levels and prices for Broilers. After the Department of Justice and civil antitrust plaintiffs sued, that practice was stopped and settled for some $30 million.

108. Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the agriculture industry. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and a lack of competition in the Broiler industry. The

workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from the Cartel eventually watered down the rules, leading to disgust among employees at the agency charged with enforcing tougher regulations.

109. In 2011, the DOJ sued to stop George's, Inc.'s acquisition of a Virginia processing plant owned by Tyson, later settling when George's made certain concessions.

110. A June 2014 USDA report states, "the [Broiler] industry faces a range of public policy issues, [including] competition . . . . [c]oncerns, [including] the exercise of market power by Broiler integrators [which] have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal Agencies."

**Relevant Market and Monopsony Power**

111. The relevant market is the purchase of Broiler Grow-Out Services (the "Relevant Market"). The relevant geographic market is the United States.

112. Here, a hypothetical firm or cartel that controlled a large share of the market for the purchase of Broiler Grow-Out Services, as the Cartel members collectively do here, could and did profitably suppress prices for Broiler Grow-Out Services below competitive levels through the alleged anticompetitive Scheme.

113. There are no close economic and/or functional substitutes to Broiler Grow-Out Services. Integrators require the production of Broilers to supply their Complexes. Broiler Grow-Out Services require unique skills and industry-specific assets that are not easily transferrable.

114. Members of the Cartel purchase in excess of 95% of Broiler Grow-Out Services in the Relevant Market. A hypothetical firm or cartel that controlled a substantial share of the market for the purchase of Broiler Grow-Out Services could profitably impose a small but significant non-transitory decrease in compensation for Broiler Grow-Out Services. Due to the

conduct challenged herein and other factors, Growers would not be able to defeat such artificial price suppression by shifting the sale of their services to non-conspiring Integrators or other purchasers.

115. As discussed, the Relevant Market is also characterized by high barriers to exit. Because meeting Integrator specifications is generally financed through loans and repaid through compensation for Broiler Grow-Out Services, and the facilities have no utility other than producing Broilers, Growers are locked into selling Broiler Grow-Out Services until they gain the financial wherewithal to exit the market.

116. Claiming to be bound by non-discrimination provisions of the Packers and Stockyards Act ("PSA"), Integrators, regardless of region of the country, (a) impose on Growers near uniform contracts (CFAs), and (b) set Grower base pay at identical or near identical levels for similarly situated Growers within a production Complex. Because Integrators tend to pay a similar base pay to their Growers regardless of geographic region, conduct that suppresses Grower compensation in one location, would necessarily suppress Grower compensation in all geographic regions in the United States. Pay decisions are made at the highest level of Integrators' business and are not made on a localized basis.

117. Absent the conduct challenged in this Complaint, Integrators would consider each other to be competitors for Broiler Grow-Out Services whether Integrators happen to be in the same region or not, given that Integrators (a) could open plants in areas where another Integrator (or other Integrators) already exist, and (b) would compete with each other on a nation-wide basis for established Growers or to incentivize potential new Growers to move to areas where Integrators have established Complexes.

118. Defendants and their Co-Conspirators collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct,

to profitably suppress compensation to Growers for Broiler Grow-Out Services below competitive levels.

**Anticompetitive Effects and Injury Suffered by Class Members**

119. As a result of the Cartel's Scheme challenged herein, Grower compensation has been suppressed below competitive levels.

120. The No-Poach Agreement had depressive compensation effects. It not only put every Grower at risk of lower pay, but it also had the actual effect of suppressing that pay. By agreeing not to "poach" a would-be rival Integrator's Growers, competition for Broiler Grow-Out Services is suppressed. The No-Poach Agreement contributes to the suppression of Grower compensation in three ways. First, the No-Poach Agreement directly suppresses competition for Broiler Grow-Out Services in areas with more than one Integrator. More than 75% of Grower Class members are situated in such geographic areas. Second, it discourages new Integrators from moving into areas with only a single Integrator. As a result of the No-Poach Agreement, a new Integrator in a particular geographic area would have to incentivize new farmers to invest in becoming Growers, rather than poaching existing Growers. It is more costly for an Integrator to encourage new Growers to invest in Broiler Grow-Out Services for that Integrator than to convince existing Growers to switch Integrators. Third, because Integrators tend to pay a similar base pay to their Growers regardless of geographic region, conduct that suppresses Grower compensation in one location suppresses Grower compensation everywhere. Fourth, Integrators refer to benchmark rates composed of nationwide Grower pay data when adjusting Grower compensation, meaning that even truly localized anticompetitive conduct would have a ripple effect on pay rates throughout the nation as it taints those benchmarks. These benchmark rates are disseminated through Agri Stats, which collects granular, confidential data from Integrators, including the Cartel Members, to create the benchmarks.

121. The DOJ has also stated that “no poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws.” This aspect of the anticompetitive Scheme here reduced competition for Grower services and thereby had a suppressive effect on Grower compensation, even controlling for Grower-specific and flock-specific factors.

122. The Cartel Members acknowledged the anticompetitive effects of their Scheme on Grower competition and pay. One Tyson manager testified that by reducing the chance of a rival Integrator recruiting Tyson’s Growers, Tyson would reduce the chances it would have to raise Grower pay to retain its Growers. While an internal Pilgrim’s email reflects that recruiting Growers from a rival Integrator would cause a “war” resulting in Integrators “up[ping] their pay more and [] los[ing] current growers.” Another internal document from a Cartel member attributes to the No-Poach Agreement a goal of “prevent[ing] starting a grower war,” a reference to the concept of a price war found in the economic and antitrust literature. Indeed, in the one documented instance of such a Grower war breaking out in the Delmarva peninsula, the Cartel increased Grower pay appreciably for all Growers in Delmarva.

123. Seeking to comply with the PSA, Integrator Defendants (a) impose substantially similar CFAs on all of their Growers, and (b) make it a practice to compensate similarly situated Growers in a like manner, with differences in compensation based on objective factors. Indeed, Integrators attempt to maintain a constant base pay across all of their Growers. Thus, any conduct that would serve to suppress compensation in one location would tend to suppress compensation everywhere.

124. In accordance with economic theory and the above allegations, the Scheme here artificially reduced the compensation of all Growers below levels that would have prevailed in its absence.

125. Moreover, under the law of supply and demand, because Grower compensation is suppressed, fewer Broilers are produced than if Growers were paid a competitive amount for their services. As a result, fewer Broilers are processed and fewer are available for sale on the retail market. Thus, the Scheme serves as a means to collectively reduce Broiler output, which ultimately causes an artificial inflation of Broiler prices to final consumers. In addition to reducing output, the Scheme also constrains the types and methods of chicken growing, which reduces the options available to consumers. Accordingly, in addition to harming the Growers, the Cartel's Scheme harmed consumers as well, through artificially inflated prices and restricted choice.

126. One means by which the Scheme artificially reduced Grower compensation was through the compensation system each Integrator uses to pay its Growers, which Integrators euphemistically call the "Tournament System."

127. Each Integrator in a given location uses the so-called Tournament System to impose a rigid and formulaic compensation scheme under which Growers whose Broilers are slaughtered in a given week are compared. Under this system, Integrators determine Grower compensation based on how Growers rank against each other ("Settlement Group"). Integrators rank each Grower in a given region against each other, based on formulaic guidelines, and then pay Growers in compensation bands based upon the results.

128. Under the rigid rules of the Tournament System, the "top-performing" half of a Grower "cohort" receives base pay plus an incentive that is a function of base pay, and the bottom half of a cohort receives base pay less a disincentive of the same amount (with average compensation across a cohort equaling base pay).

129. The Defendants and their Co-Conspirators rank their Growers in a given region against each other according to, *inter alia*, so-called feed conversion rates. Feed conversion rates are based on, among other things, the amount of feed used to attain weight gain. Defendants pay Growers whose

chicks had a better feed conversion rate the base amount multiplied by a bonus factor, and pay Growers whose chicks had a lower feed conversion rate the base amount multiplied by a diminution factor. This is not a "profit sharing" system. The total amount paid by the Integrators does not increase if total feed conversion rates increase.

130. Moreover, the Tournament System ensures that the anticompetitive effects caused by Defendants translate into reduced compensation for all Class members, including: (a) Growers receiving base pay times a bonus factor, (b) Growers receiving base pay, and (c) Growers receiving base pay times a diminution factor. In any given week, all Growers are being paid less than they would be paid in a competitive market without the illegal Scheme because each sub-group's compensation is pegged to the suppressed base pay amount. The anticompetitive conduct alleged herein thus artificially suppresses the pay levels under the Tournament System below levels that would have prevailed absent the anticompetitive Scheme alleged herein.

131. Since the 1980s, the inflation adjusted market price of Broilers has risen relatively steadily, while the Growers' share of that market price has fallen, with Integrators pocketing the difference. Since at least 2007, inflation-adjusted Grower pay has shown a significant, downward trend, while consumer prices have increased; this widened gap between farm gate prices and retail prices shows that neither the Grower nor consumer are better off under the Integrators' collective grip. Since 2008, there has been a nearly 50% increase in Broiler wholesale prices, despite input costs (primarily corn and soybeans) falling roughly 20% to 23%. A quarter of Growers have negative net farm income, meaning they spend more money than they make from providing Broiler Grow-Out Services to Integrators. In 2006, average income was only $20,000 for medium Growers, accounting for 50% of Broiler production. In 2011, real Grower returns on investments were negative except for the largest of Growers, while 20% of small Growers failed to cover cash expenses, and nearly a third of small Growers and a fifth of large Growers had negative net farm income. These limited or negative

earnings come at the expense of investing hundreds of thousands if not over a million dollars on land, grow-out houses, and capital upgrades. As one commentator has observed, “contract producers who once had acceptable income from their poultry operations now put a few hundred thousand dollars of equity and borrow several hundred thousand more to hire themselves at minimum wage with no benefits and no real rate of return on their equity.”

132. An Oklahoma State University budget for Growers published in 2006 shows a loss of $4,260 annually on a $255,000 investment, while the Alabama Farm Business Analysis Association showed negative annual returns in 10 of the 15 years between 1999 and 2009, with average aggregate losses over that time period of $182,000. Some commentators have criticized the latter study as under-reflective of losses, as it reflects payouts 10% above actual average payouts.

133. Class members similarly earn disproportionately low incomes when compared to their large debt burdens and workload, reporting net incomes between $12,000 and $40,000 a year despite generally working twelve-to-sixteen hours a day, seven days a week, fifty-two weeks a year.

134. Meanwhile, Integrators like Pilgrim’s and Tyson rake in more than $2 billion and $3.6 billion a year, respectively, in ***profits***.

## FRAUDULENT CONCEALMENT

135. As a result of the fraudulent actions of the Defendants and their Co-Conspirators, the Scheme was concealed from the Class. Plaintiffs did not know and, by the exercise of due diligence could not have known, that they might have had a cause of action prior to May 9, 2024, the date on which the class was certified *In re Broiler Chicken Grower Antitrust Litigation (No. II)*, No. 6:20-md-02977-RJS-CMR (E.D. Okla.) (Dkt. No. 410).

136. The Defendants and their Co-Conspirators took active steps to conceal their unlawful activities. The Cartel orchestrated their Scheme in secret, discussing and reaching agreement on the

parameters of the No-Poach Agreement in non-public discussions. These conversations occurred through email communications, in-person visits, private telephone calls, and trade association meetings. The Defendants and their Co-Conspirators were successful in concealing the scheme from the Class. In fact, the Cartel members have denied and continue to deny that these no-poach agreements ever existed.

137. Members of the Class could not, through reasonable diligence, uncover sufficient information to plead their claims until the May 9, 2024 class certification decision in *In re Broiler Chicken Grower Antitrust Litigation (No. II)*, which put into the public record a robust set of facts and admissions from Co-Conspirators concerning the No-Poach Agreement. For the avoidance of doubt, Plaintiffs do not allege, or seek fraudulent concealment with respect to, any separate theory of harm predicated on a rule of reason analysis for unlawful information sharing, which could have been plausibly pled prior to May 9, 2024.

## CLASS ACTION ALLEGATIONS

139. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) as representatives of a "Class" defined as follows:

> All individuals and entities in the United States and its territories that were compensated for Broiler Grow-Out Services by a Defendant or Co-Conspirator, or by a division, subsidiary, predecessor, or affiliate of a Defendant or Co-Conspirator, at any time during the period of January 27, 2013 through and until December 31, 2019.

140. Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed. The following persons and entities are excluded from the proposed Class: federal government entities, the Defendants, Co-Conspirators, and any of their subsidiaries, predecessors, officers, or directors.

141. The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains thousands of similarly situated Growers.

142. Plaintiffs' claims are typical of those of the Class.

143. Plaintiffs and all members of the Class were injured by the same unlawful conduct, which resulted in all of them receiving less in compensation for their Grow-Out Services than they would have in a competitive market.

144. Plaintiffs will fairly and adequately protect and represent the interests of Class. The interests of the Plaintiffs are not antagonistic to the Class.

145. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because the Defendants and their Co-Conspirators have acted and refused to act on grounds generally applicable to the class members.

146. Questions of law and fact common to the Class include:

(1) Whether the Defendants and their Co-Conspirators' agreement not to "poach" each other's Growers constitutes (a) an agreement, combination, or conspiracy in restraint of trade in violation of the Sherman Antitrust Act, and/or (b) an unfair or deceptive practice in violation of the Packers and Stockyards Act;

(2) Whether the Defendants and their Co-Conspirators' anticompetitive Scheme suppressed Grower compensation below competitive levels; and

(3) The proper measure of damages.

147. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust and unfair competition litigation.

148. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without

the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

**COUNT ONE**
**Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Antitrust Act**

149. Plaintiffs incorporate each allegation above as if fully set forth herein.

150. The Defendants and their Co-Conspirators have engaged in an anticompetitive Scheme to suppress Grower compensation involving agreeing not to solicit or "poach" one another's Growers.

151. The Scheme resulted in reduced compensation for all Growers below levels that would otherwise have prevailed.

152. There are no procompetitive justifications for the Defendants and their Co-Conspirators' conduct, or if there are, they are outweighed by the anticompetitive effects and, in any event, could be achieved through less restrictive means.

153. This Scheme is a per se violation of the Sherman Antitrust Act.

**COUNT TWO**
**Unfair Practices in Violation of Section 202 of the Packers and Stockyards Act**

154. Plaintiffs restate and re-allege the above paragraphs as if fully set forth in this cause of action.

155. Defendants are "live poultry dealers" within the meaning of the Packers and Stockyards Act, as they obtain poultry in commerce, ship or sell poultry in commerce, and are "engaged in the business of obtaining live poultry by purchase or under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." 7 U.S.C. § 182(10).

156. Plaintiffs seek damages for violation of the PSA, 7 U.S.C. § 192(a), which makes it unlawful for "any live poultry dealer with respect to live poultry, to . . . (e)ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device."

157. Plaintiffs seek damages for violation of the PSA, 7 U.S.C. § 192(f)(3), which makes it unlawful for "any live poultry dealer with respect to live poultry, to . . . manipulate or control prices."

158. Plaintiffs seek damages for violation of the PSA, 7 U.S.C. § 192(g), which makes it unlawful for "any live poultry dealer with respect to live poultry, to . . . [c]onspire, combine, agree or arrange with any person to do, or aid and abet the doing of, any act made unlawful by subdivision[] (a) . . . ."

159. The Defendants and their Co-Conspirators used this information to suppress Grower compensation.

There are no procompetitive justifications for the Defendants and their Co-Conspirators' conduct, or if there are, they can be achieved through less restrictive means.

160. These practices by the Defendants and their Co-Conspirators adversely affected and injured competition in violation of the Packers and Stockyards Act.

**PETITION FOR RELIEF**

Plaintiffs petition for the following relief:

A. A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

B. A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act and the Packers and Stockyards Act;

C. A judgment and order requiring Defendants to pay damages to Plaintiffs and the members of the Class, trebled;

D. An order enjoining Defendants from engaging in further unlawful conduct;

E. An award of attorneys' fees and costs;

F. An award of pre- and post-judgment interest on all amounts awarded; and

G. Such other and further relief as the Court deems just and equitable.

**REQUEST FOR TRIAL BY JURY**

Plaintiffs request a trial by jury of all issues so triable.

Dated: March 6, 2026

Respectfully submitted,

*/s/ Daniel J. Walker*
*(Signed by Jason L. Lichtman with permission of Daniel J. Walker)*
*/s/ Jason L. Lichtman*

Daniel J. Walker*
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
Email: dwalker@bergermontague.com

Eric L. Cramer*
Patrick F. Madden*
Michaela L. Wallin*
Sarah R. Zimmerman*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: ecramer@bergermontague.com
Email: pmadden@bergermontague.com
Email: mwallin@bergermontague.com
Email: szimmerman@bergermontague.com

Gary I. Smith, Jr.*
**HAUSFELD LLP**
580 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 633-4980
Email: gsmith@hausfeld.com

Erika A. Inwald*
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
Email: einwald@hausfeld.com

***Co-Lead Counsel for Plaintiffs and the Proposed Class***

*<u>/s/ Jason L. Lichtman</u>*
Jason L. Lichtman
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
Email: jlichtman@lchb.com

Brendan P. Glackin
Lin Y. Chan
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: bglackin@lchb.com
Email: lchan@lchb.com

***Liaison Counsel for Plaintiffs and the Proposed Class***

Larry D. Lahman*
Roger L. Ediger*
**MITCHELL DECLERK, PLLC**
202 West Broadway Avenue
Enid, OK 73701
Telephone: (580) 234-5144
Facsimile: (580) 234-8890
Email: ldl@mdpllc.com
Email: rle@mdpllc.com

Charles D. Gabriel*
**CHALMERS, BURCH & ADAMS, LLC**
North Fulton Satellite Office
5755 North Point Parkway, Suite 251
Alpharetta, GA 30022
Telephone: (678) 735-5903
Facsimile: (678) 735-5905
Email: cdgabriel@cpblawgroup.com

J. Dudley Butler*
**BUTLER FARM & RANCH LAW GROUP, PLLC**
499-A Breakwater Drive
Benton, MS 39039
Telephone: (662) 673-0091
Facsimile: (662) 673-0091
Email: jdb@farmandranchlaw.com

Michael L. Silverman*
**ROACH LAW FIRM**
205 North Michigan Ave., Suite 810
Chicago, IL 60601
msilverman@rlbfirm.com

***Additional Class Counsel for Plaintiffs and the Proposed Class***

* *pro hac vice*

**CERTIFICATE OF SERVICE**

I, Jason L. Lichtman, an attorney, hereby certify that the **Consolidated Class Action Complaint** was electronically filed on March 6, 2026, and will be served electronically via the Court's ECF Notice system upon the registered parties of record.

Dated: March 6, 2026

*/s/ Jason L. Lichtman*
Jason L. Lichtman